

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-8-2002

# Televantos v. Lyondell Chem Co

Precedential or Non-Precedential:

Docket 1-2476

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"Televantos v. Lyondell Chem Co" (2002). *2002 Decisions.* Paper 162.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/162

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 01-2476


YIANNAKIS JOHN TELEVANTOS,

Appellant

v.

LYONDELL CHEMICAL COMPANY;
LYONDELL CHEMICAL WORLDWIDE, INC.


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No.99-cv-05966)
District Judge:  Hon. James T. Giles


Submitted Under Third Circuit LAR 34.1(a)
February 7, 2002

Before:  SLOVITER, AMBRO, Circuit Judges, and SHADUR, District Judge

(Filed   March 8, 2002 )


OPINION OF THE COURT

SLOVITER, Circuit Judge.

                                        I.

Appellant, Yiannakis John Televantos, brought suit in the United States District Court for the Eastern District of Pennsylvania against his former employer, Lyondell Chemical Company ("Lyondell"), seeking benefits payable under a Change of Control Plan (the "Plan") applicable when an employee resigns within two years of a change of control due to the occurrence of a relocation of the employee's principal place of work. Televantos was employed by ARCO Chemical Company ("ARCO") in Newtown Square, Pennsylvania as Vice President for the Research and Development Business Urethanes. In anticipation of a possible takeover, ARCO developed and adopted a Change of Control Plan in April 1998. The Plan is an employee benefit plan governed by the requirements and provisions of the Employee Retirement Income Security Act ("ERISA") of 1974, 29 U.S.C. 1001 et. seq. (2001).

The Plan provides, inter alia, payment of severance benefits to qualifying participants for the purpose of enabling the company to "be able to retain the services of its executives and personnel in the event of a Change of Control of the Company, during the pendency of a possible Change of Control, and following a Change of Control, to ensure their continued dedication and efforts in any such event without undue concern for their personal financial and employment security." App. at 389.

Article V, Paragraph 5.1(a) provides for benefits if, within two years of a change of control, the participant's employment "terminates for any reason . . . other than . . . (D) a termination, voluntary resignation or retirement by the Participant without Good Reason." App. at 397. "Good Reason" is defined in Article II, Paragraph 2.11 as "the occurrence after a Change of Control of any of the following events or conditions," including "the relocation of the Participant's principal place of work, but only if the 'moving expenses' incurred in connection with such relocation would be deductible under Section 217 of the Internal Revenue Code of 1986, as amended." App. at 394. The referenced section of the tax code provides that moving expenses "paid or incurred . . . in connection with the commencement of work . . . at a new principal place of work" are

deductible if, inter alia, they involve a move of greater than fifty miles. I.R.C. 217(a),(c) (2001).

At the time the Plan was distributed to employees, ARCO also distributed a Summary of the Change of Control Plan (the "Summary"). The Summary explicitly states that it is not meant to replace the official Plan documents, which govern in the event of any inconsistency with the Summary. The Summary states that, as "an additional measure of protection for employees," an employee "may elect to leave the Company and still be entitled to receive" Plan benefits. App. at 413. In describing circumstances under which this could happen, the Summary states that an individual in Televantos' employment level "may elect to terminate employment upon request or requirement . . . to relocate to a new work location." App. at 413.

In July 1998, Lyondell acquired all of the stock of ARCO through a cash tender offer and as a result acquired control of ARCO. This stock acquisition constituted a "change of control" under the Plan. On March 30, 1999, Lyondell sent Televantos a letter offering him employment at the same position he held with ARCO, and had held since the change in control, and stating that on or about February 1, 2000, his position "will be located" in Houston. Similar letters were sent to a number of employees. The letter further stated that "[i]f you decline this offer, you will be eligible for the Change of Control package. However, in order to receive this payment, you must complete all transitional assignments. This date is determined by management at the sole discretion of management." App. at 385. The letter asked Televantos to respond by April 30, 1999 as to whether he would accept or decline this offer.

On May 7, 1999, Televantos returned the letter stating that he would decline the offer to relocate in his position to Houston. Soon thereafter, he accepted an offer of employment with Foamex, a local company and customer of Lyondell, with whom Televantos had been in employment negotiations since prior to his receipt of the March 30 letter. His employment agreement with Foamex was dated May 21, 1999 but included a provision stating that his employment would not begin until he had completed his

"transitional work assignments" with Lyondell. App. at 423. However, the Agreement also bound Televantos to "devote his entire working time" to Foamex beginning on May 21, 1999. On May 21, 1999, Televantos met with his supervisor at Lyondell and informed him that he had accepted a position with Foamex, would complete all transitional assignments with Lyondell, and wanted to receive the Plan benefits. In the next two weeks, Lyondell informed Televantos that his last day of work would be June 11, 1999. Continued employment with Lyondell and the completion of transitional assignments was deemed impossible because Foamex's position as a customer of Lyondell created a conflict of interest.

When Televantos inquired about the amount of his Plan benefits, he was informed by Lyondell's Vice President of Human Resources that he would not be receiving any benefits under Article V. Televantos brought this lawsuit against Lyondell seeking these benefits under the Plan. The District Court conducted a bench trial and found in favor of Lyondell, concluding that the Plan's definition of "Good Reason" was not ambiguous and required the "actual occurrence of the relocation of the participant's principal place of work." App. at 5-7.

## II.

### A. Jurisdiction and Standard of Review

The District Court had jurisdiction pursuant to 28 U.S.C. 1331 because the complaint sought benefits under 29 U.S.C. 1132(a)(1)(B). This court has jurisdiction over the final decision of the District Court pursuant to 28 U.S.C. 1291. Televantos filed a timely appeal.

Traditional rules of contract construction govern our review of an employment benefit plan under ERISA. See Int'l Union v. Skinner Engine Co., 188 F.3d 130, 138 (3d Cir. 1999). The determination of whether a provision of a contract is clear or ambiguous is a question of law subject to plenary review by this court. See Bill Gray Enters., Inc. Employee Health and Welfare Plan v. Gourley, 248 F.3d 206, 218 (3d Cir. 2001); Williams v. Metzler, 132 F.3d 937, 946 (3d Cir. 1997).

### B. Contract Ambiguity

Televantos argues that the District Court erred in finding the relevant terms of the

Plan unambiguous. He argues that the Plan's definition of "Good Reason" was ambiguous and he posits an interpretation of that term that would entitle him to benefits. In order to evaluate his claim, we must first examine the terms of the document to determine if the relevant provisions are clear or ambiguous. Employee benefits plans governed by ERISA are subject to the same principles as contracts in general. See In re Unisys Corp. Long-Term Disability Plan ERISA Litig., 97 F.3d 710, 715 (3d Cir. 1996).

"A [contract] term is ambiguous if it is susceptible to reasonable alternative interpretations." Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc., 198 F.3d 415, 421 (3d Cir. 1999). To determine whether a clause is ambiguous, "courts must first look to the plain language of [the] document." Bill Gray, 248 F.3d at 218. While the strongest evidence of whether a contract is unambiguous are the words of the agreement, we may consider additional sources if necessary to determine if the words of the contract were given their common meaning. These additional sources include "'the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation. Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.'" Bethlehem Steel Corp. v. United States, 270 F.3d 135, 139 (3d Cir. 2001) (quoting Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993)). Once a contract's terms are found unambiguous, we may no longer consider extrinsic evidence in order to interpret those terms. Bill Gray, 248 F.3d at 218.

The relevant language in this case is the language of the Plan quoted above defining what constitutes "Good Reason." The District Court concluded that this language was not ambiguous and held that "relocation . . . means what it says, there must be relocation – – there must be an occurrence of the relocation." App. at 6. In other words, the Plan requires the employee to remain with the company until his or her place of work actually moves to a new location. The District Court concluded that "[g]iven the

words occurrence in conjunction with relocation of the principal place of work, and moving expenses incurred, past tense, then it follows that there must have been – – there would have to be an actual occurrence of the relocation of the participant's principal place of work."  App. at 7.

Giving the contract terms their common and accepted meanings, the words of the provision support the District Court's conclusion that the provision is unambiguous: "Good reason" means the "occurrence" of "the relocation of the Participant's principal place of work."  App. at 394.  The latter part of the provision is also unambiguous, stating that the relocation serves as Good Reason "only if the 'moving expenses' incurred in connection with such relocation would be deductible" under the provision of the tax code defining "moving expenses."  App. at 394.  The clear import of this segment of the provision is to convey that the relocation contemplated must be, inter alia, to a location in excess of fifty miles away, and that relocations to areas closer do not qualify as Good Reason to resign and receive benefits.

The District Court seemed to place some emphasis on the fact that the word "incurred" was in the past tense, and Televantos argues that the District Court erroneously interpreted the provision to require that the employee must have physically moved and incurred expenses in order to receive the benefits under the Plan.  If the District Court read the Plan to have required an actual move by an employee before severance payments would be due, then that reading would be erroneous, as Televantos argues.  But contracts must not be read in a light that leads to an unreasonable outcome.  See Bohler-Uddeholm America Inc. v. Ellwood Group, Inc., 247 F.3d 79, 96 (3d Cir. 2001).  Although the word "incurred" is in the subjunctive rather than in the past tense, that is not really the issue.  What controls instead are the facts that the required "relocation" refers to an actual change in the principal place of work   something that had not taken place before Televantos left his employment   and that the provision about moving expenses refers to those that would be incurred in connection with "such relocation."  Thus, the Plan does not require that the employee himself have entered into a physical move, but rather that

the employee's principal place of work must have moved. Therefore, reading the District Court's opinion in its entirety, we read it as holding that employees are eligible for benefits when their principal place of work makes the actual transition from one location to another location at least fifty miles away.

Under our plenary review, this court can look to extrinsic evidence to determine if the words of the contract are ambiguous. Televantos would have us look to the Summary of the Plan created by ARCO and distributed to ARCO employees, which states in part:

> To provide an additional measure of protection for employees . . . under certain specified circumstances, an individual may elect to leave the Company and still be entitled to receive the change-of-control allowances under the Plan. In general accord with industry practices, these circumstances are somewhat different for specified levels of employee . . .
>
> for [individuals in Televantos' employment level] . . . an individual in these grade levels may elect to terminate employment upon request or requirement to . . . relocate to a new work location.

App. at 413 (emphasis added).

Televantos would have us hold that the March letter notifying him that his position would relocate to Houston in February 2000 was a "request or requirement" to relocate, triggering his eligibility for benefits according to the Summary. We agree with the District Court's conclusion that the Summary does not render the Plan's terms ambiguous. While the Summary is written in terms of "request" or "requirement" to relocate as opposed to the "occurrence" of relocation, the terms of the Summary still comport with the terms of the Plan. Like the Plan, the Summary refers to "a new work location"  something that did not exist at the time of the request, but was instead an aspect of Lyondell's future planning.

Accordingly, the more reasonable reading of the Plan is that it requires employees to remain with the company until the time their principal place of work relocates because such a policy (1) provides the company with the security of a stable work force during a time of transition and (2) rewards those employees with generous compensation to provide them with security after their place of work relocates and they choose not to

follow.  In fact, Televantos' place of work never did move to Texas because of a
subsequent sale of the relevant work place to a local company.

As the District Court noted, "Dr. Televantos chose not to take the risk associated
with staying with Lyondell."  App. at 10.  By choosing to leave when his "status, title or
responsibilities were not changed and [his] position was not relocated in fact," Televantos
became ineligible for Plan benefits.  App. at 9.  We agree.

                              III.
     For the reasons stated above, we will affirm the decision of the
District Court.
_____
TO THE CLERK:
                                                    Please file
the foregoing opinion.


                                                    /s/
Dolores K. Sloviter
                              Circuit Judge